1998-NMCA-101

961 P.2d 790

**George O. LOTSPEICH,
Plaintiff–Appellee,**

v.

**GOLDEN OIL COMPANY, a Delaware
Corporation, Defendant–Appellant.**

**No. 18248.**

Court of Appeals of New Mexico.

June 11, 1998.

L. Michael Messina, Glenn R. Smith, Messina, Madrid & Smith, P.A., Albuquerque, for Appellee.

Philip Craig Snyder, Campbell & Snyder LLP, Albuquerque, for Appellant.

*OPINION*

DONNELLY, Judge.

{1} Defendant Golden Oil Company appeals from an order awarding summary judgment to Plaintiff on his complaint alleging breach of contract, and dismissing Defendant's counterclaim alleging fraud. Defendant argues that there are two reasons why summary judgment was improperly granted on its counterclaim: (1) that Plaintiff's motion for summary judgment was not directed at Defendant's counterclaim for fraud; and (2) that material issues of fact exist concerning the matters alleged in Defendant's counterclaim. We hold that there is a material issue of fact as to whether Defendant was justified in relying on Plaintiff's alleged misrepresentations, and reverse.

*FACTS AND PROCEDURAL POSTURE*

{2} Plaintiff was the chief executive officer of Cobb Resources Corporation (Cobb), as well as a director and principal shareholder from the 1970s through the early 1990s. In late 1990 Defendant was successful in its campaign to obtain a controlling interest in Cobb, and Defendant ultimately obtained 39.3% of Cobb's outstanding common stock. Defendant forced Plaintiff out of his position as Cobb's chief executive officer and chairman of the board, in part because Defendant asserted it was uncomfortable with alleged self-dealing that it discovered between Plaintiff and Cobb. Ralph T. McElvenny, Jr., who was Defendant's chief executive officer, chairman of the board, and president, assumed those same positions for Cobb.

{3} On April 5, 1991, Defendant entered into a complex asset purchase agreement, contingent upon the approval of Cobb's shareholders. Under the terms of the agreement, Defendant acquired Cobb's oil and gas interests in exchange for common stock of Defendant corporation. In negotiating the purchase agreement, Cobb's board of directors, including McElvenny who served as its chairman, were aware that Cobb also owned certain mining interests. Cobb's shareholders approved the asset purchase agreement on March 18, 1992, and Cobb distributed to its shareholders 90% of the stock in the Defendant corporation that it received pursuant to the asset purchase agreement.

{4} As part of the asset purchase agreement with Cobb, Defendant agreed to assume certain compensation claims that Plaintiff asserted were owed to him by Cobb. On February 12, 1993, the parties completed negotiation of a settlement of Plaintiff's compensation claims. At the same time that Plaintiff and Defendant were negotiating their settlement, Defendant was also negotiating with some principal Cobb shareholders to trade back their distributed stock in the Defendant corporation in return for Cobb stock owned by Defendant.

{5} According to affidavits filed by Defendant, in the course of their review of the value of Cobb's stock, McElvenny and Darryl L. Emmert, Defendant's vice president, requested information from Plaintiff regarding two assets that had been virtually written off on Cobb's balance sheet: an interest in a copper mine known as the Copper Flats Project in Sierra County, New Mexico, and common stock held in American Boulder Gold, an Australian mining company. Since the 1960s, Plaintiff had intermittently been a stakeholder in the Copper Flats Project and he had a working knowledge of the mining industry in that region. At the time of Defendant's inquiry, Cobb owned 51% of the Copper Flats Project and Plaintiff owned the remaining 49% through his ownership of Hydro Resources Corporation. Additionally, by virtue of Plaintiff's relationship with Cobb, he had been directly involved in the London Mine Venture, a joint mining venture between Cobb and a subsidiary of American Boulder Gold. In early 1992 Defendant was aware both that (a) the Copper Flats Project included proven reserves and (b) there were only minimal ongoing operations in connection with the London Mine Venture and the mine had environmental water discharge problems.

{6} According to McElvenny and Emmert, Plaintiff informed them that Cobb's interests in the Copper Flats Project and the American Boulder Gold stock were worthless. Defendant asserts that it relied on Plaintiff's statements in its negotiations of the terms of settlement of his compensation

claims against Cobb. Several months later, the Copper Flats Project and the American Boulder Gold stock generated over $400,000 in income for Cobb, and the value of Cobb's shareholders' equity rose by 350%. Subsequently, Defendant alleges Plaintiff admitted to McElvenny that, at the time he told Defendant's officers that Cobb's interests in the Copper Flats Project and the American Boulder Gold securities were worthless, he was aware of the imminent likelihood of the deals pertaining to those interests that later proved to be of great benefit to Cobb. McElvenny alleged that if he had known the true value of Cobb's assets, based on the deals that Plaintiff had not disclosed, he would not have negotiated the same terms with Plaintiff in order to settle his compensation claims against Cobb, nor would he have negotiated the same terms with Cobb shareholders to trade back their stock in Defendant in return for Cobb stock owned by Defendant.

{7} Defendant refused to comply with the terms of the parties' 1993 compensation claims agreement, and Plaintiff filed suit in 1996. Defendant counterclaimed that Plaintiff's misrepresentations as to the value of the Copper Flats Project and the American Boulder Gold stock constituted fraud. Upon motion of Plaintiff, and after a hearing, the trial court granted summary judgment for Plaintiff, stating in a letter opinion that Defendant's claim of fraud was not viable in that, as a matter of law, it could not claim reliance on Plaintiff's valuation of Cobb's interests because (a) Defendant knew that Plaintiff had a substantial ownership in the Copper Flats Project and American Boulder Gold, (b) the compensation agreement that is the basis of Plaintiff's claim for breach of contract was an arm's length transaction and was negotiated over a period of time, (c) Defendant had a majority interest in the property, and (d) Defendant was a sophisticated and successful business owner. The trial court also stated that the assertion in affidavits submitted by Defendant that Plaintiff committed fraud against Defendant was merely "an attempt to manufacture a material issue of fact[,]" and that a mere assertion cannot defeat a motion for summary judgment absent other evidence of fraud. Defendant takes this appeal from the order

granting summary judgment to Plaintiff and dismissing its counterclaim.

## WHETHER THE MERITS OF DEFENDANT'S COUNTERCLAIM WERE PROPERLY BEFORE THE TRIAL COURT

{8} Defendant argues that summary judgment with respect to its counterclaim for fraud was improper because (1) Plaintiff's memorandum in support of his motion did not assert that no issue of material fact existed with respect to the counterclaim, *see* Rule 1–056(D)(2) NMRA 1998; and (2) Plaintiff failed to file any evidentiary materials contravening Defendant's claim that Plaintiff made false statements to McElvenny and Emmert. We need not address this contention because, as explained below, we determine that the award of summary judgment should be reversed on other grounds.

## WHETHER SUMMARY JUDGMENT WAS PROPERLY GRANTED ON DEFENDANT'S COUNTERCLAIM OF FRAUD

{9} Defendant contends that summary judgment was improper because there were genuine issues of material fact concerning its counterclaim of fraud. The elements of common-law fraud are: "(a) a misrepresentation of fact, (b) known by the maker to be false, (c) made with the intent to deceive and to induce the other party to act in reliance, and (d) actually relied on by the other party to his or her detriment." *Eoff v. Forrest,* 109 N.M. 695, 699, 789 P.2d 1262, 1266 (1990); *see also Sierra Blanca Sales Co. v. Newco Indus., Inc.,* 84 N.M. 524, 536, 505 P.2d 867, 879 (Ct.App.1972).

## STANDARD OF REVIEW

{10} "[O]rdinarily claims of fraud present an issue of fact which cannot be determined on motion for summary judgment[.]" *General Acceptance Corp. v. Hollis,* 75 N.M. 553, 555, 408 P.2d 53, 55 (1965); *see also Sierra Blanca Sales Co.,* 84 N.M. at 540, 505 P.2d at 883 (absence of reliance is not a matter of law, it is a question of fact). Summary judgment on Defendant's counterclaim of fraud is proper only if there is no genuine issue as to any material fact and Plaintiff is entitled to judgment as a matter of law. *See El Paso Natural Gas Co. v. Kysar Ins. Agency, Inc.,* 93 N.M. 732, 735, 605 P.2d 240, 243 (Ct.App.

1979). In determining whether any such material issues of fact exist, we draw all reasonable inferences in favor of Defendant, the party opposing the motion for summary judgment. *See id.*

{11} Plaintiff contends that it was within the trial court's discretion to reject the assertions set forth in McElvenny's and Emmert's affidavits on the grounds that they were self-serving, without factual support, and contradicted by disclosures made in a proxy statement to Cobb's shareholders and in filings with the Securities and Exchange Commission. We reject this contention for the following reasons.

{12} The claims set forth in the affidavits are neither conclusory nor without a factual base. Both corporate officers' affidavits contain numerous and specific assertions of fact offered in support of Defendant's claim that Plaintiff allegedly engaged in fraud. *See Zamora v. Creamland Dairies, Inc.,* 106 N.M. 628, 632, 747 P.2d 923, 927 (Ct.App.1987) (rejecting claim that affidavit did not meet the requirements of Rule 1–056(E)); *cf. Pedigo v. Valley Mobile Homes, Inc.,* 97 N.M. 795, 798, 643 P.2d 1247, 1250 (Ct.App.1982) (affiant's statement as to "possible" cause of fire was self-serving speculation, factually unsupported opinion testimony, and made without personal knowledge).

{13} The affidavits and deposition testimony in the three federal cases relied upon and cited by Plaintiff, we believe, are distinguishable from the affidavits in the instant case. In *United States v.1980 Red Ferrari,* 827 F.2d 477, 480 (9th Cir.1987), the court's ruling was only that even if it credited the deponent's testimony on his "understanding" regarding ownership of the seized vehicle, the uncontroverted facts showed that he could have avoided knowledge only by "sticking his head in the sand," so he could not claim the "innocent owner" defense to a forfeiture action. In *Slowiak v. Land O'Lakes, Inc.,* 987 F.2d 1293, 1297 (7th Cir.1993), and *Palmer v. Circuit Court of Cook County, Soc. Serv. Dep't,* 905 F.Supp. 499, 504 (N.D.Ill. 1995), *aff'd on other grounds,* 117 F.3d 351 (7th Cir.1997), the courts stated that the unsubstantiated, self-serving affidavits could not defeat summary judgment. But in both cases the affidavits contradicted the affiant's

prior deposition testimony. We do not understand the rule in the Seventh Circuit to bar consideration of an affidavit setting forth statements that would be admissible as trial testimony by the affiant when the affidavit is not inconsistent with prior sworn statements by the affiant. If the Seventh Circuit would reject such affidavits, we respectfully disagree. *See Sanders v. Smith,* 83 N.M. 706, 710, 496 P.2d 1102, 1106 (Ct.App.1972) (where factual conflict exists in plaintiffs' testimony, summary judgment is improper because the court may not weigh or resolve conflicts in the evidence). We leave to another day whether to adopt the Seventh Circuit rule in any respect.

{14} Plaintiff argues that the affidavits of McElvenny and Emmert, the president and vice-president of the Defendant corporation, were insufficient to raise a factual issue concerning Defendant's claim that it was fraudulently induced to enter into the agreement with Plaintiff, because of previous disclosures made in a proxy statement and a Form 10–K signed by McElvenny and submitted to the Securities and Exchange Commission. The disclosures were made in conjunction with the asset purchase agreement between Defendant and Cobb.

{15} There was no conflict between McElvenny's assertion of fraud and the proxy statement materials or Securities and Exchange Commission filings. The gist of the claim of fraud was that Plaintiff knew of the imminence of transactions that would affect the value of Cobb's interest in the Copper Flats Project and American Boulder Gold. There is no evidence in the record that the officers of Defendant knew of the impending transactions at the time they prepared the securities documents, or even that the transactions were contemplated at the time those documents were being prepared.

{16} In responding to Defendant's claim of reliance on Plaintiff's opinions concerning the value of Cobb's mining interests, Plaintiff asserts that "[he] did not own" the Copper Flats Project or the American Boulder Gold stock. However, it is undisputed that Hydro Resources Corporation, a business in which Plaintiff owned a substantial

interest, owned 49% of the royalty payments from the Copper Flats Project. Additionally, Defendant does not base its reliance on Plaintiff's opinion as to the value of the American Boulder Gold stock on a claim that Plaintiff owned the securities. Rather Defendant points to Plaintiff's direct involvement in the London Mine Venture, a joint mining venture between Cobb and a subsidiary of American Boulder Gold, as evidence that Plaintiff possessed special knowledge concerning the value of the latter firm.

{17} Lastly, we consider Plaintiff's claim that Defendant's reliance on his opinions was not justified because of the adversarial relationship that existed between the parties, and which was manifested by their protracted compensation negotiations and the accusations of self-dealing that led Defendant to force Plaintiff from his position as chief executive officer of Cobb. We cannot say, however, that the adversarial quality of the parties' relationship and their prior dealings are sufficient as a matter of law to permit an award of summary judgment under the circumstances existing here. *See* Restatement (Second) of Torts § 541A (1977) ("The recipient of a fraudulent misrepresentation of fact may be justified in relying upon it although he believes the maker to have an adverse interest in the transaction."). Only where a representation is obviously false or where the recipient has reason to know of facts making reliance unreasonable, is he invested with a duty to investigate the truth of statements made to him. *See id.* cmt. a. Absent these special circumstances,

> [i]t is not enough to relieve the maker of a fraudulent misrepresentation from liability that the person to whom it is made makes an investigation of its truth. It is only when he relies upon his investigation and does not rely upon the false statement that he cannot recover. Whether he does rely upon the one or the other or in substantial part upon both, is a question of fact and is for the jury to determine, unless the evidence clearly indicates only one conclusion.

*Id.* § 547 cmt. a (citation omitted). In the instant case, the evidence does not clearly indicate only one conclusion.

{18} To be sure, ordinarily one cannot rely on an opinion in a transaction with the person who stated the opinion. *See* Restatement, *supra* § 542. But the same rule does not apply to a representation of fact, and a statement of opinion can be reasonably understood as implying no incompatible facts. *See id.* § 539 cmt. a; § 538A (definition of opinion); § 542 cmt. b. Here, a rational fact finder could determine that Plaintiff's alleged statement that the properties were worthless could be reasonably understood as implying that there were no imminent deals to pay substantial sums for the properties.

## CONCLUSION

{19} In sum, we hold that Defendant presented sufficient evidence to show the existence of material issues of fact which preclude the award of summary judgment and the dismissal of Defendant's counterclaim for fraud. Thus, the order granting summary judgment and dismissing the counterclaim is reversed.

{20} IT IS SO ORDERED.

HARTZ, C.J., and ARMIJO, J., concur.